IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2020

**JOHN ALAN CHAPMAN V. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Grundy County**
**No. 6321      Thomas W. Graham, Judge**

_____

**No. M2019-00429-CCA-R3-PC**
_____

The petitioner, John Alan Chapman, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Matthew S. Bailey, Spencer, Tennessee (on appeal) and Paul Cross and Howell W. Clements, Monteagle, Tennessee (at hearing), for the petitioner, John Alan Chapman.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Mike Taylor, District Attorney General; and David L. Shin, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for first degree murder, aggravated kidnapping, and aggravated sexual battery, as follows:

On April 19, 1990, Michelle Blake, the victim in this case, was employed as a clerk at the Pit Stop South, a gas and convenience store in McMinnville. Mrs. Blake was twenty-six years old, married and the

mother of a four-year-old daughter. On this date, she was scheduled to work the 3:00 p.m. to 11:00 p.m. shift. At 5:15 p.m., Mrs. Blake's husband, William Blake, arrived at the Pit Stop South to pick up the couple's vehicle, a Ford Bobcat. He left the business, traveled to a video store, and then went home. As was customary, Blake was to return to the Pit Stop later that evening with his wife's dinner.

Around 8:30 p.m., Ed Martin stopped at the store to purchase gasoline. Martin pumped three dollars worth of gasoline and went inside the store to pay. As Martin was leaving the store, Mrs. Blake remarked, "I wish he'd go ahead and leave. I've already pumped his gas," referring to a man sitting outside the front of the store in an older model gray Chevrolet pick up truck which displayed Grundy County license plates.

Fifteen minutes later, around 8:45 p.m., Sylvia Fults and her husband pulled into the drive-through window of the Pit Stop South to purchase cigarettes. Although she depressed the customer assistance button, no clerk appeared. She then noticed Mrs. Blake at the full service pump with a jug in her hand. Mrs. Blake re-entered the store to wait on Fults. While waiting on Fults, Mrs. Blake

> talked about this guy being there before getting gas and talking about him being so weird. She said he had been there earlier and got gas in his truck and he had left or started to leave, and came back and had her put gas in a can, and she said, 'Now he's back wanting it in a jug.'

Mrs. Blake also told Fults that this man had asked her if she had wanted any help since she was at the store by herself. During this conversation, Fults noticed a man in the store who looked like he was trying to scare Mrs. Blake. When she was leaving the parking lot, she observed a "gray primer color" pick up truck with chrome parked in front of the store.

Mary Jones lives across the street from the Pit Stop South. Around 8:55 p.m. on April 19, 1990, she heard what she thought to be a scream coming from the front of her house. After hearing an apparent second scream, she went to her front porch where she observed a truck on the Pit Stop's parking lot. She stated that the truck was a "gray primer color" and had a Chevrolet logo across the back of the tailgate. She noticed a man and a woman in the truck. Ms. Jones related that "at one time it looked like she

pulled away from him." She assumed that, more than likely, it was simply a "domestic problem." The truck then pulled out of the parking lot and onto Highway 55. She commented that, as the truck left the parking lot, it was going very fast and that it made loud sounds.

At 9:05 p.m., as planned, William Blake returned to the Pit Stop South with his wife's[] dinner. When he arrived at the Pit Stop, he noticed two vehicles in the parking lot. Two customers approached him and inquired as to "what was going on" as there was no attendant on duty. Immediately, Blake began to search the premises for his wife. During this search, one of the customers discovered Mrs. Blake's eyeglasses in the parking lot. At this point, the police were called and the owner of the station, Mr. Stanton, arrived. After inspecting the premises, Mr. Stanton stated that no money had been taken from the cash register, although the key that functioned as the "on-off" switch was missing. A search then began in Warren County for Michelle Blake.

Joe Roper informed law enforcement officials that, while traveling home on the evening of April 19, 1990, on route 108, a vehicle came up behind him at an excessive rate of speed and passed him on a double yellow line. He described the vehicle as being a gray Chevrolet pick up truck with large tires and Grundy County license plates. Roper also stated that there were two people in the truck. Dale Winton reported that, at 9:05 p.m., he was traveling on highway 127 when a vehicle came up behind him "real fast" and swerved around him, almost running him off the road. He described the vehicle as being a dark colored 1979 or 1980 Chevrolet pick up truck with "cherry bomb mufflers" and chrome on the side of the truck.

Danny Wannamaker, whose residence is directly adjacent to the Philadelphia Cemetery in Grundy County, testified that, at around 9:20 p.m. on April 19, 1990, he took a shower and prepared for bed. Around 9:50 p.m., he heard a vehicle that sounded like it did not have a muffler. He looked out the window, but did not see anything. Again, he heard the vehicle stop for a few minutes, then "the motor was turned off, cranked back up and took off, again approaching the house." Herbert Lewis, who also lives behind the Philadelphia Cemetery, was at home alone on the evening of April 19, 1990. Shortly after 9:30 p.m., he heard what appeared to be a female screaming for help, followed shortly thereafter, by a loud vehicle coming around the bend from behind the graveyard. He explained that he was not alarmed by the screams because he was "use (sic) to hearing people screaming, raising cane (sic) at the volleyball court."

The next morning between 7:00 and 7:30 a.m., Sharon Shannon, the daughter of Herbert and Melba Lewis, dropped her six-month-old son off at her parents' home. As she was leaving, she spotted what at first appeared to her to be shoes, however, she soon realized it was a body. Because her eleven year old daughter was in the vehicle with her, she did not stop, but returned to her parents' home instead. After leaving her daughter with her parents, Shannon returned to the cemetery to verify the presence of the body and then contacted the authorities. The body was identified as that of Michelle Blake.

An investigative team with the Tennessee Bureau of Investigation arrived at the scene. The victim was found fully clothed with her blouse partially unbuttoned. Her brassiere was missing. The victim's body was examined for the presence of hair, fibers, and fingerprints. Joe Minor, a member of the investigative team, testified that a whitish stain which appeared to be semen was discovered on the left breast of the victim's body. The whitish stain extended from the victim's breast to her stomach. Examination of the stain revealed that the substance did contain spermatozoa, and further testing indicated that the source of the semen was a Type B secretor.

Dr. Charles Harlan, the chief medical examiner for the State of Tennessee, performed an autopsy upon the body of Michelle Blake on April 21, 1990. His report identified a total of seven stab wounds, one to the left side of the neck, four to the left breast, and two to the mid-line of the back. He indicated that the wounds were caused by a single sided instrument, three to three and one-half inches in length. Three of the wounds caused damage to main organs which resulted in the victim's death, i.e., damage to the carotid artery, damage to the heart, and damage to the right lung. He opined that death occurred within three to ten minutes of the injuries. The medical examiner further explained that a sharp line of demarcation existed on the victim's neck, indicative of ligature strangulation. He noted there were no defensive wounds and no evidence of forcible vaginal intercourse. He also determined that the victim's blood was type O.

Despite descriptions of the perpetrator, his truck, and available scientific evidence, the case remained unsolved for over two years. In July, 1992, Special Agent Larry Davis with the Tennessee Bureau of Investigation, was called to assist Grundy County officials in the investigation of the June 7 murder of Vicky Sue Metzger, whose body was

discovered at the I–24 Eastbound Rest Area near Monteagle. On July 13, Davis interviewed the [petitioner] who was the attendant on duty at the rest area on the date of the murder. The attendant at the westbound rest area was also interviewed. Neither man was placed under arrest, although both men were asked to submit blood samples for DNA comparison analysis on semen found on the victim. On November 5, 1992, Davis was requested to assist in the investigation of an assault on another victim at the I–24 Eastbound Rest Area. On this occasion, the [petitioner] was identified as the assailant and was in custody at the Monteagle police station when interviewed by Agent Davis. The [petitioner] "stated that he had assaulted the victim because he had been drinking and smoking marijuana." Again, the [petitioner] submitted to blood testing.[1]

From these tests, it was determined that the [petitioner] has Type B blood. Review of the case file at this point led authorities to the belief that the [petitioner] may have been involved in the 1990 death of Michelle Blake. DNA comparison analysis was then requested on the [petitioner]'s blood sample and the semen sample recovered from Mrs. Blake's body. The results from the tests revealed that the DNA binding pattern on each sample matched. Additional forensic tests established that fibers found on the victim's clothing were consistent with the fibers found in the carpet of the [petitioner]'s Chevrolet pick up truck. The proof at trial established that, in April, 1990, the [petitioner] lived in Grundy County and was employed by a nursery in Warren County. On occasion, after regular working hours at the nursery, he would work for his supervisor, Floyd Hardcastle, who lived in Warren County. When working for Mr. Hardcastle, his commute to and from home would take him by the Pit Stop South. The [petitioner] admitted that he had, on occasion, purchased gas at the Pit Stop South. However, when showed the photograph of Michelle Blake at trial, he stated that he did not recognize her. On cross-examination, the State introduced a payroll check from Hardcastle to the [petitioner], dated March 3, 1990, which was cashed at the Pit Stop South, bearing the initials "M.B." The initials were identified as being those of Michelle Blake. The [petitioner] also admitted that, in April, 1990, he owned a 1977 gray Chevrolet short-bed pickup truck which displayed Grundy County license plates. He stated that he sold the truck in the spring of 1991. Additionally, the proof established that, in April of 1990, the

---

[1] Evidence of the crimes against Vicky Sue Metzger and Pamela Sue Back, the second victim at the I-24 eastbound Rest Area, was developed during pre-trial suppression hearings.

[petitioner]'s truck had other matching characteristics to that of the truck driven by the abductor of Michelle Blake.

*State v. John Allen Chapman*, No. 01C01-9604-CC-00137, 1997 WL 602944, at \*1-4 (Tenn. Crim. App. Sept. 30, 1997), *perm. app. denied* (Tenn. May 11, 1998).

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief on March 26, 1999, in which he argued, in part, trial counsel was ineffective for failing to object to hypnosis testimony given by the State's witnesses, failing to adequately prepare for trial, and failing to request a mental evaluation of the petitioner. The petitioner also argued the trial court erred in failing to sua sponte order a mental evaluation of the petitioner. Counsel was appointed on January 12, 2000; however, an amended petition for post-conviction relief was not filed until October 9, 2018. In the amended petition, the petitioner argued trial counsel was ineffective for failing to object to the blood sample used for DNA analysis because it exceeded the scope of the petitioner's consent. An evidentiary hearing was held on November 16, 2018, during which trial counsel, the petitioner, and Larry Davis testified.[1] Although the petitioner asserted numerous claims in his petition and amended petition, we will summarize only the evidentiary hearing testimony relevant to his claims on appeal.

The petitioner testified he and trial counsel, who was appointed following the petitioner's arrest, met only two times prior to trial. Each visit lasted less than hour, possibly less than thirty minutes. Because the petitioner and trial counsel did not meet on a regular basis, they were unable to discuss several issues, including the petitioner's alibi and his statement to police. Additionally, the petitioner wanted trial counsel to locate the previous owner of his truck to determine whether the dome light was working at the time the truck was purchased by the petitioner.

The petitioner also testified he was prescribed high doses of Elavil prior to and during his trial. The medication put the petitioner "in a daze," and he "was not able to follow everything that was going on" in the courtroom because he "was in and out a lot." However, trial counsel failed to request a mental evaluation of the petitioner. On cross-examination, the petitioner acknowledged that, prior to his arrest, he was able to hold down a job, drive a vehicle, and support his wife and child.

---

[1] At the beginning of the evidentiary hearing, the testimony of Karen McGuffey was submitted as a proffer of proof. However, the post-conviction court ruled her testimony was both irrelevant and inadmissible.

Regarding hypnosis testimony, the petitioner testified that, at the time of his trial, he was not aware hypnosis testimony was permissible in Tennessee.[2]  Trial counsel and the petitioner did not discuss the effect of hypnosis testimony "at great length," and trial counsel "sort of swept [the testimony] under the rug."

On cross-examination, the petitioner admitted to giving a blood sample in July 1992 to compare his DNA to evidence found on Vicky Sue Metzger.  However, the petitioner stated he believed the blood sample was court-ordered because he was served with a subpoena from Larry Davis.

Trial counsel testified both he and co-counsel met with the petitioner prior to trial.  Although trial counsel could not recall the exact number of visits, he and the petitioner met more than two times to go over information and "look at every angle."  In addition to the time he spent with the petitioner, trial counsel traveled to Atlanta to speak with a professor at Emory University regarding "the mathematical probabilities of a random occurrence" and to Birmingham to meet with a DNA expert.

Trial counsel did not request a mental evaluation of the petitioner because he did not see any indication one was needed.  Although the petitioner was quiet during their meetings, he "seemed to listen very intently" to what trial counsel was saying, and, if trial counsel had noticed a lack of comprehension or understanding, he would have "pursued that avenue."

Larry Davis, an investigator with the District Attorney's Office, testified he previously worked as a special agent with the Tennessee Bureau of Investigation for twenty-three years.  During the early 1990s, Mr. Davis was assigned to Franklin and Grundy counties, and, in July 1992, Mr. Davis led the investigation into the murder of Ms. Metzger.  During his investigation, Mr. Davis interviewed the petitioner, who worked at the rest area where the murder occurred, and issued a subpoena for the petitioner to meet him at the Grundy County jail to give a statement.  After taking the petitioner's statement, Mr. Davis requested a blood sample to compare the petitioner's blood type to the DNA evidence found on Ms. Metzger.  The petitioner consented to the blood draw.

While Mr. Davis was awaiting the results of the analysis of the petitioner's blood sample, the petitioner was arrested for assaulting Pamela Sue Back at the same rest area where Ms. Metzger's body was found.  The petitioner confessed, alleging he drank

---

[2]  At trial, Ed Martin and Sylvia Fults testified they were subjected to hypnosis following Ms. Blake's murder.  However, our review of the record does not indicate the hypnosis of either Mr. Martin or Ms. Fults refreshed their memories or induced previously unremembered facts.

alcohol and smoked marijuana prior to assaulting Ms. Back. Mr. Davis requested a blood sample to determine the petitioner's blood alcohol content ("BAC"), and the petitioner again consented.

Several days after the petitioner gave the blood sample in the Back case, Mr. Davis met with Danny Wix, the lead investigator in the Michelle Blake case, and Pete Bouldin, an investigator with the District Attorney's Office.[3] When Special Agent Wix told Mr. Davis he was going to request a search warrant for the petitioner's blood to compare with DNA evidence found on Ms. Blake, Mr. Davis gave Special Agent Wix the blood sample he had obtained from the petitioner in the Back case. The sample was analyzed by Cellmark, and the DNA results were introduced in the petitioner's trial for the murder of Ms. Blake. Mr. Davis later obtained the results of the analysis of the blood sample taken from the petitioner in the Metzger case, and this evidence was introduced in the Metzger murder trial without objection.

On cross-examination, Mr. Davis acknowledged that the petitioner had already confessed to Ms. Back's assault at the time the second blood sample was requested. However, Mr. Davis wanted to know if the petitioner was telling the truth about whether he had been drinking alcohol and smoking marijuana at the time of the assault. Mr. Davis stated he did not advise the petitioner that a DNA analysis would be performed on the second blood sample because, at the time the sample was taken, a connection had not been made to the Blake murder. Mr. Davis also acknowledged the sample from the Back case was never tested for drugs or alcohol.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

*Analysis*

On appeal, the petitioner asserts trial counsel was ineffective for failing to object to the introduction of the blood sample, failing to object to hypnosis testimony, failing to adequately prepare for trial, and failing to request a mental evaluation of the petitioner. The petitioner also asserts the trial court erred in failing to sua sponte order a mental evaluation of the petitioner, post-conviction counsel failed to diligently present all reasonable claims, and cumulative error warrants a new trial.[4]

I. **Trial Counsel**

---

[3] Danny Wix died prior to the post-conviction hearing.
[4] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the petitioner's brief.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or

- 9 -

"a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## A.     Failure to Object to Blood Sample

The petitioner argues trial counsel was ineffective for failing to object to the introduction of DNA evidence taken from the blood sample the petitioner provided in the Back case. Specifically, while the petitioner acknowledges trial counsel objected to the sample as involuntary, the petitioner contends that conducting a DNA analysis on the sample exceeded the scope of his consent. The State contends the petitioner has failed to meet his burden.

The standard for measuring the scope of a defendant's consent is "'that of objective reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect.'" *State v. Troxell*, 78 S.W.3d 866, 872 (Tenn. 2002) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Relevant considerations include the officer's expression of the object of the search and any expressed or implied limitations by the person giving consent as to the time, duration, area, or intensity of the search. *Id.* at 871-872.

At the evidentiary hearing, Larry Davis testified he requested a blood sample from the petitioner following the petitioner's arrest in the assault of Pamela Sue Back. The petitioner confessed to Ms. Back's assault, claiming he drank alcohol and smoked marijuana prior to the attack. Mr. Davis requested a blood sample to perform alcohol and drug tests, and the petitioner consented to the blood draw. Several days later, Mr. Davis spoke with Danny Wix, the lead investigator in the Michelle Blake murder, who told Mr. Davis that he intended to subpoena the petitioner's blood for DNA analysis. Although, following this conversation, Mr. Davis gave Special Agent Wix the petitioner's blood sample from the Back case, Mr. Davis testified he had not made a connection between Ms. Back's assault and Ms. Blake's murder at the time that he requested the blood sample from the petitioner. Additionally, the petitioner had previously consented to a blood draw for DNA analysis in the murder of Vicky Sue Metzger, and Mr. Davis was awaiting the results of that analysis at the time of the assault on Ms. Back. The petitioner did not testify regarding his consent to the blood sample in the Back case but stated he

believed the sample he gave in the Metzger case was court-ordered. Trial counsel was not asked any questions regarding the petitioner's consent to either blood sample.

In support of his position, the petitioner cites numerous cases from other jurisdictions and relies primarily on *Graves v. Beto*, 424 F.2d 524 (5th Cir. 1970). This reliance, however, is misguided. In *Graves*, the defendant was arrested on charges of public drunkenness. Shortly after the defendant's arrest, police received a report of a rape, and, because the defendant matched the description of the alleged rapist, police requested a blood sample to compare to blood found on the victim's bed. Although the defendant initially refused to give a blood sample, he eventually consented after being told the sample would be used *only* to determine the alcohol content of his blood. Because the government agent was found to have engaged in active misrepresentation to secure the defendant's consent, the court refused to allow the blood sample to be used later to establish identity. However, the court noted "that a blood sample taken in good faith for a legitimate purpose – with consent or under the license of Schmerber – can[] upon new developments be used for another purpose not originally contemplated." *Id.* at 525 n.1.

In this case, there is no evidence in the record to indicate any deception on the part of Mr. Davis or to suggest the defendant initially refused to give consent or limited the scope of his consent in any way. The post-conviction court implicitly accredited Mr. Davis's testimony in its order denying relief, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Furthermore, although the petitioner now argues trial counsel was deficient for objecting to the blood draw on the basis of voluntariness as opposed to the scope of consent, the petitioner himself argued the blood draw was involuntary in his 1999 pro se petition for post-conviction relief, asserting he "was physically abused by [Mr.] Davis and forced into giving a sample of his blood against his will." This is the same argument trial counsel made at the pre-trial suppression hearing. Accordingly, we conclude trial counsel was not deficient in failing to argue the blood sample taken in the Back case exceeded the scope of the petitioner's consent.

Moreover, even if the DNA analysis on the blood sample from the Back case exceeded the scope of the petitioner's consent, the DNA evidence would have been inevitably discovered after Mr. Davis received the results of the analysis on the blood sample from the Metzger case. Illegally obtained evidence is admissible under the inevitable discovery doctrine if it would have otherwise been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *State v. Ensley*, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5.

- 11 -

In this case, at the time the blood sample at issue was taken, Mr. Davis was awaiting the results of the DNA analysis on the sample taken in the Metzger case. The Metzger blood sample was taken with the petitioner's consent for the specific purpose of blood typing and DNA analysis. Using the results of the Metzger sample, Mr. Davis would have inevitably discovered that the petitioner's DNA matched the DNA found on Ms. Blake, and this evidence would have been admissible at trial. The petitioner is not entitled to relief on this issue.

**B.      Failure to Object to Hypnosis Testimony**

The petitioner argues trial counsel was ineffective for failing to object to hypnosis testimony offered by the State. The petitioner contends the State failed to lay a proper foundation for the testimony of Ed Martin and Sylvia Fults, citing *State v. Glebock*, 616 S.W.2d 897 (Tenn. Crim. App. 1981). The State contends trial counsel was not deficient because hypnosis testimony was not introduced at trial.

At the post-conviction hearing, trial counsel was not asked any questions regarding hypnosis testimony, and the petitioner testified trial counsel did not discuss the effects of hypnosis testimony "at great length." Although, at trial, both Mr. Martin and Ms. Fults testified they were hypnotized following Ms. Blake's murder, nothing in the record suggests the hypnosis of either Mr. Martin or Ms. Fults induced previously unremembered facts, and the State did not attempt to introduce any testimony by Mr. Martin or Ms. Fults that was induced or refreshed by hypnosis. Therefore, there was no requirement for the State to lay the foundation for hypnotic testimony as stated in *Glebock*. The petitioner failed to show trial counsel's failure to object to hypnosis testimony amounted to deficient performance, and he is not entitled to relief on this issue.

**C.      Failure to Adequately Prepare for Trial**

The petitioner argues trial counsel was ineffective for failing to adequately prepare for trial, including failing to meet with the petitioner for an appropriate amount of time given the severity of his charges. The State contends trial counsel adequately prepared for trial.

At the post-conviction hearing, the petitioner testified trial counsel met with him two times at the jail, staying less than one hour each time. Because of the lack of communication, the petitioner and trial counsel were unable to discuss several important issues, including the petitioner's alibi and his statement to police. The petitioner also wanted trial counsel to locate the original owner of his truck to prove the dome light was not working at the time the truck was purchased by the petitioner; however, the petitioner

failed explain the significance of the dome light or why it matter if the light was working at the time the truck was purchased. Although trial counsel could not recall the exact number of visits, he testified that he and co-counsel met with the petitioner more than two times because they needed "to look at every angle." Trial counsel also drove to Atlanta and Birmingham to meet with mathematical and DNA experts.

Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Thus, the petitioner has not shown deficient performance on the part of trial counsel. Furthermore, the petitioner has failed to establish a reasonable probability that the result of the proceeding would have been different if trial counsel had spent more time with him, especially in light of the overwhelming evidence against the petitioner. *Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief on this issue.

## D.     Failure to Request Mental Evaluation

The petitioner argues trial counsel was ineffective for failing to request a mental evaluation. The petitioner contends trial counsel's testimony at the post-conviction hearing supports his assertion that he was not able to assist in preparing his defense. The State contends trial counsel was not ineffective in failing to request a mental evaluation of the petitioner.

At the post-conviction hearing, the petitioner testified he was on high doses of Elavil prior to and during his trial, which left him "in a daze" and unable "to follow everything that was going on." Trial counsel testified he did not notice anything during his representation of the petitioner that would indicate a mental evaluation was necessary. Although the petitioner was quiet during their meetings, trial counsel stated the petitioner "seemed to listen very intently." If trial counsel had noticed a lack of comprehension, he would have "pursued that avenue."

The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. The applicable test to determine competency to stand trial is whether the defendant has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings against him. *State v. Benton*, 759 S.W.2d 427 (Tenn. Crim. App. 1988). There is nothing in the record to suggest the petitioner was unable to meaningfully consult with trial counsel or that he did not understand the proceedings against him. Furthermore, the petitioner failed to produce any medical proof at the post-

conviction hearing supporting his claim. The petitioner is not entitled to relief on this issue.

## II. Trial Court's Failure to Order Mental Evaluation

The petitioner argues the trial court erred in failing to sua sponte order a mental evaluation of the petitioner. The petitioner contends the trial court had the opportunity to observe the petitioner at several pre-trial hearings and could have noticed he was in a daze. Further, the petitioner argues this issue is not waived because the waiver provision in effect at the time the petitioner filed his pro se petition allowed a petitioner to overcome the presumption that an issue was waived for failing to raise it before a previous court. The State contends the petitioner has waived this issue by failing to challenge it on direct appeal.

Under the Post-Conviction Procedure Act governing this petition, a ground for relief is waived if "the petitioner on his own or through his attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g) (1995). "There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived." *Id.* § 40-30-210(f) (1995). "Waiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney." *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995).

Because the petitioner could have presented this issue for our review on direct appeal but chose not to, it is waived. Furthermore, the petitioner did not present any medical proof at the post-conviction hearing to support his claim, and he has, therefore, failed to show the trial court had any reasonable basis to order a mental evaluation or declare the petitioner incompetent. The petitioner is not entitled to relief on this issue.

## III. Post-Conviction Counsel's Failure to Present All Reasonable Claims

The petitioner argues post-conviction counsel erred in waiting eighteen years to file an amended petition for post-conviction relief. The petitioner further contends he was prejudiced by the delay because the court reporter did not have the original trial transcripts, the petitioner's memory was no longer fresh, and the lead investigator in the Blake case was not available to testify at the post-conviction hearing. The State contends the petitioner received a full and fair hearing as required by law.

There is no constitutional entitlement to the effective assistance of counsel in a post-conviction proceeding. *Stokes v. State*, 146 S.W.3d 56, 60 (Tenn. 2004); *House v.*

*State*, 911 S.W.2d at 712. Although there is a statutory right to post-conviction counsel, this does not include the "full panoply of procedural protection that the Constitution requires be given to defendants who are in a fundamentally different position – at trial and on first appeal as of right." *House*, 911 S.W.2d at 712 (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987). "The appointment of counsel assists in ensuring that a petitioner asserts all available grounds for relief and fully and fairly litigates these grounds in a single post-conviction proceeding." *Leslie v. State*, 36 S.W.3d 34, 38 (Tenn. 1999).

The Post-Conviction Procedure Act provides in relevant part that the court to whom the post-conviction case is assigned shall examine all pertinent records and documents and either dismiss the case or enter a preliminary order. Tenn. Code Ann. § 40-30-106. The preliminary order should appoint counsel, if necessary, and direct either counsel or the petitioner if proceeding pro se to file within thirty days, unless extended for good cause, either an amended petition or written notice that no amendment will be filed. *Id.* § 40-30-107.

The record reflects that the petitioner filed a petition for post-conviction relief on March 26, 1999, and the preliminary order appointing post-conviction counsel was filed on January 12, 2000. However, post-conviction counsel did not file an amended petition for post-conviction relief until October 9, 2018. While we agree post-conviction counsel's delay in filing the amended petition for post-conviction relief was much longer than necessary, this Court has previously noted that "there is no indication at all that the legislature, or the Tennessee Supreme Court, intended for a petitioner to be granted post-conviction relief simply because of non-compliance of performing an act within a certain time limit." *George Thurman Haynie, Jr. v. State*, No. M2001-01522-CCA-R3-PC, 2002 WL 464822, at *7 (Tenn. Crim. App. Mar. 26, 2002), *perm. app. denied* (Tenn. Sept. 16, 2002). Furthermore, due process in the post-conviction setting requires only that the petitioner have "the opportunity to be heard at a meaningful time and in a meaningful manner." *House*, 911 S.W.2d at 711. After reviewing the record, we conclude the petitioner was provided a full and fair hearing on his claims for post-conviction relief as required by law. The petitioner is not entitled to relief on this issue.

## IV. Cumulative Error

Finally, the petitioner contends the cumulative effect of the errors alleged above entitles him to a new trial. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). Because the petitioner has not established any error, he is not entitled to relief under the cumulative error doctrine.

**Conclusion**

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE